**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**VICTORIA PERKINS**                                                                              **PLAINTIFF**

**VS.**                                                   **CIVIL ACTION NO. 3:23-CV-00091-MPM-RP**

**PANOLA COUNTY BOARD OF
SUPERVISORS, EARL BURDETTE, IN HIS
INDIVIDUAL AND OFFICIAL CAPACITIES,
COLE FLINT, IN HIS INDIVIDUAL AND OFFICIAL
CAPACITIES, CHAD WEAVER, IN HIS INDIVIDUAL
AND OFFICIAL CAPACITIES, AND JOHN DOES
1-20**                                                                                      **DEFENDANTS**

**ORDER**

This cause comes before the court on the motion of defendants, who are three members of the Panola County Board of Supervisors, to dismiss the claims asserted against them in their individual and official capacities. This court, having considered the memoranda and submissions of the parties, is prepared to rule.

This is a § 1983 case which alleges the sort of "do you know who I am?" small-town abuse of power which is, in this court's experience, all too plausible. In particular, the amended complaint in this case alleges that Panola County Supervisor Earl Burdette, assisted by his fellow supervisors Cole Flint and Chad Weaver, sought to retaliate against plaintiff, who at the time was serving as a Panola County sheriff's deputy, for having secured custody of Burdette's grandchild from Burdette's son and returned that child to his lawful guardian. Specifically, plaintiff's complaint alleges that she "was dispatched to a distress call from a citizen of Panola County who stated that her minor child was with an adult male and that the adult male refused to return the minor child to the custody of her, the minor child's legal guardian." [Amended complaint at 3].

1

Plaintiff alleges that, having been so dispatched, she then "called Defendant Burdette's son and instructed him to immediately return the minor child to her guardian."

Plaintiff alleges that, at this point, Supervisor Burdette showed up on the scene with his grandchild and that he heatedly protested being required to surrender custody of the child. Specifically, the amended complaint alleges that:

> 19. Defendant Burdette became very angry upon seeing Plaintiff and began to verbally assault her in the presence of the other deputy and the minor child's guardian. Defendant Burdette stated he would "make her pay." The entire interaction was captured on Plaintiff's body camera.

[*Id.* at 4]. Plaintiff thus claims to have video evidence of Supervisor Burdette promising to seek revenge against her for having returned his grandchild to his lawful guardian, and her amended complaint alleges that Burdette immediately set upon backing up his threat. For example, plaintiff alleges that:

> 20. Following the incident, Defendant Burdette approached Plaintiff's boss, Sheriff Shane Phelps and stated Plaintiff acted improperly on the night mentioned above, and instructed Sheriff Phelps that Plaintiff should be disciplined.

> 21. Sheriff Phelps reviewed Plaintiff's body camera footage from the night in question and determined Plaintiff had acted properly and performed the duties of her position as required. He declined to discipline or reprimand Plaintiff.

[*Id.*] Plaintiff thus alleges that, having reviewed video of the encounter, Sheriff Phelps determined that she had acted properly and that, based on this conclusion, he resisted Supervisor Burdette's attempts to have her disciplined.

The amended complaint alleges that, at this point, three members of the Panola County Board of Supervisors – defendants Burdette, Flint and Weaver - began to demonstrate an extraordinary degree of interest in revoking leave benefits which had previously been awarded to plaintiff. In describing the nature of these benefits, plaintiff alleges that:

> 12. Plaintiff previously took leave from her post to attend to a personal health issue.

13. Plaintiff's coworkers voluntarily donated their accrued leave time to Plaintiff so that she would continue to receive her regular wages while she attended to her health.

14. Plaintiff subsequently returned to her post.

[*Id.* at 3]. In describing how she got wind of the efforts to have these leave benefits revoked, plaintiff alleges that:

24. Since this incident, Plaintiff received word that members of the Panola County Board of Supervisors, namely Earl Burdette, Cole Flint, and Chad Weaver, were seeking to revoke her coworkers' donations of leave time and require Plaintiff to repay the wages she received while on leave.

25. Plaintiff, by and through her attorneys, notified Defendants that she would seek to oppose any repayment of her wages and/or garnishment of future wages.

[*Id.* at 4-5].

The amended complaint alleges that plaintiff's leave benefits were, in fact, eventually revoked by a three-to-two vote of the Board of Supervisors and that her wages were garnished in order to recoup the revoked leave. Plaintiff's complaint alleges a litany of procedural irregularities relating to the revocation of her leave benefits, as follows:

26. The Panola County Board of Supervisors Board Attorney, Gaines Baker, advised that an opinion was being requested from the Mississippi Attorney General's Office in order to guide the Board in its decision.

27. On or around May 2, 2022, Baker told counsel for the Plaintiff he would provide a copy of the opinion as soon as it was received.

28. On or around August 2, 2022, Plaintiff was notified by her supervisor that the Board of Supervisors had voted the day before, August 1, 2022, to require her to repay the wages she was paid while on leave.

29. Neither Plaintiff nor her attorneys were notified that the Board would be considering the issue. Rather, they had been assured by Mr. Baker that the Board was awaiting the Attorney General's opinion.

30. The Board had not received the opinion from the Attorney General's office at the time of its vote. Baker confirmed this with counsel for Plaintiff.

31. Defendants Burdette, Flint, and Weaver voted in favor of the repayment while the other two Board members voted against it. The vote was initiated by motion of Defendant Burdette and then seconded by Defendant Weaver.

32. Subsequently, Defendants began garnishing Plaintiff's wages without proper authority or following proper procedure.

33. Mississippi law requires an order of judgment, decree or attachment, from a court, to entitle a creditor to garnish the wages of the debtor. Mississippi law further requires that the debtor be served in accordance of law with the writ of garnishment. Specifically, the Plaintiff, as an employee of a county, should be properly served with the writ of garnishment and due process provided to her should she wish to oppose the writ of garnishment.

34. Defendants did not seek an order of judgment, decree or attachment from a court to entitle them/it to garnish Plaintiff's wages. Further, Defendants did not serve Plaintiff correctly with a writ of garnishment, likely due to the fact that Defendants have failed to seek the issuance of such in a court of law.

35. Plaintiff was not served and/or provided with a copy of the Board's Order until she requested it on October 14, 2022.

[*Id.* at 6-7].

It is at this point that this court will state for the record what should be clear from the above recitation of plaintiff's allegations, namely that it believes that she has asserted strong and plausible claims that she was retaliated against by the defendants in this case for having simply done her job, in such a manner as to constitute a severe abuse of official power. This court notes, however, that not everything which is reprehensible (or even outrageous) is unconstitutional, and, since plaintiff's § 1983 claims require her to properly allege a violation of the U.S. Constitution, it is fair to ask whether she is able to do so in this case.

In attempting to properly place this case within the framework of federal law, this court's initial legal inquiry differed somewhat from that set forth in either side's briefing. Specifically, in considering plaintiff's allegations that she was singled out for punitive action by the Board of Supervisors in an arbitrary manner, this court's first impression was that this might present a "class of one" equal protection claim under the U.S. Supreme Court's decision in *Village of Willowbrook v. Olech*, 528 U.S. 562, 563–64, 120 S. Ct. 1073, 1074 (2000). *Olech* is, in this court's experience, a powerful decision which has assisted many plaintiffs in obtaining redress for arbitrary and/or vindictive actions against them by government officials. Its importance is

4

magnified by the fact that the U.S. Supreme Court has been quite reluctant to recognize civil claims based on substantive due process, *see e.g. Albright v. Oliver*, 510 U.S. 266 (1994), thus leaving "class of one" equal protection claims as a crucial tool for redressing constitutional injuries.

In *Olech*, the plaintiffs asked the Village of Willowbrook to connect their property to the municipal water supply. *Olech*, 528 U.S. at 563. The Village at first conditioned the connection on the Olechs granting the Village a 33–foot easement. *Id.* The Olechs objected, claiming that the Village only required a 15–foot easement from other property owners seeking access to the water supply and that, by requiring them to grant a 33-foot easement, the municipality was denying them the equal protection of the law. In finding that these claims had potential merit, the U.S. Supreme Court wrote that:

> Olech's complaint can fairly be construed as alleging that the Village intentionally demanded a 33–foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15–foot easement from other similarly situated property owners. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint also alleged that the Village's demand was "irrational and wholly arbitrary" and that the Village ultimately connected her property after receiving a clearly adequate 15–foot easement. These allegations, quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis.

*Olech*, 528 U.S. at 565. *Olech* thus makes it clear that the Equal Protection Clause's protections are implicated when a "class" of even a single plaintiff is treated in an arbitrary and capricious manner by the government, thus denying him the equal protection of the laws.

This court initially believed that the heart of plaintiff's allegations in this case fell squarely within *Olech*'s wheelhouse, since she alleges that she was singled out by Burdette and two of his fellow supervisors based on simple personal vindictiveness over her handling of his son's custody dispute. *Olech* makes clear that basing governmental decisions upon personal

vindictiveness of this sort may constitute an arbitrary and capricious exercise of governmental

power which may give rise to a "class of one" Equal Protection claim. However, in deciding

whether it should apply *Olech* as precedent in this case, this court's research revealed that the

U.S. Supreme Court has since held that that class-of-one equal-protection claims may not be

asserted in the context of discretionary public-employment decisions. *See Engquist v. Oregon

Dep't of Agric.*, 553 U.S. 591, 603, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008). Based on

*Engquist*, the Fifth Circuit has made it clear that a class-of-one equal-protection claim "is

unavailable in a 'public employment context.' " *Chavers v. Morrow*, 2010 WL 3447687, at *5,

2010 U.S. Dist. LEXIS 89432, at *13 (S.D. Tex. Aug. 30, 2010) (citing *Engquist*, 553 U.S. at

594, 128 S.Ct. 2146).

In explaining its decision to exempt public employees from *Olech*'s protection, the

Supreme Court wrote that:

> We have long held the view that there is a crucial difference, with respect to
> constitutional analysis, between the government exercising "the power to regulate or
> license, as lawmaker," and the government acting "as proprietor, to manage [its] internal
> operation." *Cafeteria & Restaurant Workers v. McElroy,* 367 U.S. 886, 896, 81 S.Ct.
> 1743, 6 L.Ed.2d 1230 (1961). This distinction has been particularly clear in our review of
> state action in the context of public employment. Thus, "the government as employer
> indeed has far broader powers than does the government as sovereign." *Waters v.
> Churchill,* 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality
> opinion). "[T]he extra power the government has in this area comes from the nature of
> the government's mission as employer. Government agencies are charged by law with
> doing particular tasks. Agencies hire employees to help do those tasks as effectively and
> efficiently as possible." *Id.,* at 674–675, 114 S.Ct. 1878. See also *Connick v. Myers,* 461
> U.S. 138, 150–151, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (explaining that the
> government has a legitimate interest "in 'promot[ing] efficiency and integrity in the
> discharge of official duties, and [in] maintain[ing] proper discipline in the public service'
> " (quoting *Ex parte Curtis,* 106 U.S. 371, 373, 1 S.Ct. 381, 27 L.Ed. 232 (1882);
> alterations in original)). "The government's interest in achieving its goals as effectively
> and efficiently as possible is elevated from a relatively subordinate interest when it acts
> as sovereign to a significant one when it acts as employer." *Waters, supra,* at 675, 114
> S.Ct. 1878 (plurality opinion). Given the "common-sense realization that government
> offices could not function if every employment decision became a constitutional matter,"
> *Connick, supra,* at 143, 103 S.Ct. 1684, "constitutional review of government

employment decisions must rest on different principles than review of ... restraints imposed by the government as sovereign," *Waters, supra,* at 674, 114 S.Ct. 1878 (plurality opinion).

*Engquist*, 553 U.S. at 598–99. Later in *Engquist*, the Supreme Court wrote that:

> The practical problem with allowing class-of-one claims to go forward in this context is not that it will be too easy for plaintiffs to prevail, but that governments will be forced to defend a multitude of such claims in the first place, and courts will be obliged to sort through them in a search for the proverbial needle in a haystack. The Equal Protection Clause does not require "[t]his displacement of managerial discretion by judicial supervision." *Garcetti v. Ceballos,* 547 U.S. 410, 423, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006).
>
> In short, ratifying a class-of-one theory of equal protection in the context of public employment would impermissibly "constitutionalize the employee grievance." *Connick,* 461 U.S., at 154, 103 S.Ct. 1684. "The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." *Bishop,* 426 U.S., at 349, 96 S.Ct. 2074. Public employees typically have a variety of protections from just the sort of personnel actions about which Engquist complains, but the Equal Protection Clause is not one of them.

*Id.* at 608–09.

While this court understands the Supreme Court's concerns about federalizing ordinary employment disputes, and it recognizes the problems inherent in "search[ing] for a needle in a haystack," it submits that the holding in *Engquist* leads to particularly unfortunate results in a case such as this one, which, accepting the allegations of plaintiff's complaint as accurate, clearly seems to involve a needle. This court also notes that the Supreme Court's qualified immunity jurisprudence provides that, in order to subject a governmental defendant to individual liability, the plaintiff must demonstrate, *inter alia*, that the defendant's conduct violated "clearly established law." Qualified immunity defenses have been raised by the individual defendants in this case, and, that being the case, *Engquist* makes plaintiff's burden of demonstrating that the defendants violated "clearly established law" far more difficult than it already was. And, as numerous qualified immunity decisions make clear, that was already extremely difficult to begin with.

Having noted the "bad news" for plaintiff in this context, this court nevertheless believes that there is at least one avenue for her to seek recovery under federal law in this case. As discussed in greater detail below, this court concludes that plaintiff's procedural due process claims against Panola County itself have potential merit, and *Engquist*'s holding does nothing to preclude such claims. Moreover, while this court agrees with defendants that plaintiff has not cited authorities "clearly establishing" the law under facts similar to those here, that is only an obstacle to plaintiff's claims against the defendant supervisors in their *individual* capacities.

This court concludes that, since the amended complaint clearly seeks to hold the defendants in this case liable in their official capacities, and since plaintiff alleges that her constitutional rights were violated by official actions of the Panola County Board of Supervisors, she is able to bypass the stringent requirements of qualified immunity and proceed even with claims regarding which the law has not been "clearly established." In arguing against its own liability in this case, Panola County notes that it was not named as a defendant, but this is immaterial. Indeed, it is well established that since "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity," it is irrelevant whether the plaintiff brings suit against a county official in his official capacity or against the county itself. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Moreover, the Supreme Court made it clear in *Monell* that "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037–38 (1978).

It seems clear to this court that the Board of Supervisors serves as the "lawmaker" for Panola County within the meaning of *Monell*, and, that being the case, its actions in this case are

attributable to the County itself. In so stating, this court notes that district courts in this state have frequently held counties to be potentially liable for actions taken by their Board of Supervisors. In *Griggs v. Chickasaw Cnty., Mississippi*, 930 F.3d 696, 699 (5th Cir. 2019), for example, the Fifth Circuit affirmed a jury's verdict against Chickasaw County based on the unanimous decision of its Board of Supervisors to eliminate the plaintiff's job position. Indeed, the issue was deemed clear enough in *Griggs* that the Fifth Circuit noted that "[t]he County does not dispute that the Board was a policymaker, or that eliminating Griggs' position was an official policy." *Griggs*, 930 F.3d at 704. This court accordingly believes that Panola County is swimming against a heavy current of authority in attempting to dispute its potential liability for the actions of its own Board of Supervisors in this case.

That brings this court to the fact that, once a plaintiff is able to properly assert a basis for municipal liability under *Monell*, it instantly becomes far easier for her to establish triable fact issues for a jury's consideration than in the qualified immunity context. To rebut a qualified immunity defense, the plaintiff must show: (1) that she has alleged a violation of a clearly established constitutional right, and (2) that the defendant's conduct was objectively unreasonable in light of "clearly established law" at the time of the incident. *Waltman v. Payne*, 535 F.3d 342, 346 (5th Cir. 2008). The "clearly established" prong often proves to be fatal to § 1983 claims against municipal officials in their individual capacities. In *Plumhoff v. Rickard*, for example, the Supreme Court upheld a qualified immunity defense on the basis of the "clearly established" prong, emphasizing that:

> An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was " 'clearly established' " at the time of the challenged conduct. *Ashcroft v. al–Kidd*, 563 U.S. [731], 131 S. Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011). And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating

it. *Id.*, at 2083–2084. In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate."

*Plumhoff*, 572 U.S. 765, 134 S. Ct. 2012, 188 L.Ed.2d 1056 (2014). Making plaintiffs' burden in this context even more difficult, the Supreme Court wrote in *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1778, 191 L.Ed.2d 856 (2015) that, to establish that any supportive precedent was "clearly established," the plaintiff must be able to cite either a decision from that Court or a "robust consensus of cases of persuasive authority in the Courts of Appeals."

It should thus be apparent that establishing a violation of "clearly established" federal law is a tall order indeed, so much so that this court frankly believes that plaintiffs who have a solid basis for municipal liability should seriously consider whether it is in their interests to assert individual claims at all. In so stating, this court notes that, even in cases where the district court denies a qualified immunity motion, it almost inevitably leads to an interlocutory appeal, which, given the stringent standards involved, is frequently successful. Moreover, while qualified immunity law places heavy pressure upon plaintiffs to fully establish their bases for liability against individual defendants at the very outset of the litigation, and it ties the court's hands by requiring that the law cited as the basis for the individual defendant's liability be "clearly established," there is no such requirement as to claims against municipalities. To the contrary, the U.S. Supreme Court has made it clear that a municipality may not assert a qualified immunity or even a "good faith" defense in § 1983 cases and that it may, instead, be held liable even under novel fact patterns where the law in question had not been clearly established. *See, e.g. Owen v. City of Indep., Mo.,* 445 U.S. 622, 657, 100 S. Ct. 1398, 1419 (1980).

This court notes that, having found a basis for municipality liability in this case, it is even able to consider the possibility that it might develop *new law* to address clear injustices: a truly

novel proposition in the qualified immunity age! In this vein, this court will take this opportunity to once again quote Fifth Circuit Judge Don Willett's criticism of the manner in which qualified immunity stifles the development of new law, describing the doctrine as:

> Section 1983 meets Catch-22. Plaintiffs must produce precedent even as fewer courts are producing precedent. Important constitutional questions go unanswered precisely because no one's answered them before. Courts then rely on that judicial silence to conclude there's no equivalent case on the books. No precedent = no clearly established law = no liability. An Escherian Stairwell. Heads government wins, tails plaintiff loses.

*Zadeh v. Robinson*, 928 F.3d 457, 479–80 (5th Cir. 2019)(Willett concurring). This court believes that one can easily see this stifling dynamic at work in this case, which involves allegations which, it submits, most people would regard as an outrageous abuse of power. Outrageous or not, however, any potential equal protection claims appear to be flatly defeated by the Supreme Court's decision in *Engquist*,[1] and any procedural due process claims against the individual defendants can only proceed if plaintiff is able to demonstrate prior authority on point which "clearly establishes" the illegality of the defendants' actions.

In arguing that their qualified immunity motions should be granted, the individual defendants write in their reply brief that:

> Plaintiff has completely failed to direct this Court to any case or cases holding that "'the violative nature of [the individual Board Defendants'] particular conduct is clearly established.'" This is because there is no such case. Perkins admits as much stating "Plaintiff cannot point to a case directly involving a Board of Supervisors voting to garnish a county employee's wages as this issue does not appear to have been litigated[.]" Instead, Perkins states only that "it is clearly established that Plaintiff had a constitutional right to her wages[,]" but "'that is not enough'" within the clearly established framework. This is the exact "high level of generality" the Supreme Court warns of.

---

[1] This court notes that plaintiff does allege that she was treated poorly because of her race in violation of the Equal Protection Clause, but it agrees with defendants that she offers no factual allegations which make a plausible claim in this regard. To the contrary, this court believes that plaintiff's recitation of the facts *undercuts* any such claim, since she makes a very powerful case that Burdette was angry at her because of his handling of his grandson's custody case, not because of her race.

> After admitting that she cannot point the Court to a case on point, Perkins does attempt to cite to two cases, however, "the facts of [the cases cited by Perkins] are dramatically different from the facts here. "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

[Reply brief at 10-11, citations omitted]. This court finds itself in agreement with defendants' qualified immunity arguments, and while it is free to offer criticisms of the "clearly established" prong, it is not at liberty to refuse to apply it.

As noted previously, this court believes that plaintiff's qualified immunity burden is made significantly heavier in this case by the U.S. Supreme Court's decision in *Engquist*. This is because, while the Supreme Court's actual holding in *Engquist* was limited to "class of one" equal protection claims, the Court justified its holding with citation to broad principles of deference to governmental employers, such as its observation that "the government as employer indeed has far broader powers than does the government as sovereign." *Engquist*, 553 U.S. at 598–99. This court further notes that the U.S. Supreme Court has, at times, framed its qualified immunity analysis in terms of whether a reasonable officer "could have believed [the conduct in question] to be lawful, in light of clearly established law and the information the . . . officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 3040 (1987). While the judicial deference to governmental employers discussed in *Engquist* clearly has its limits, this court believes that the Supreme Court's opinion serves to widen the scope of what a reasonable government officer "could have believed" the Constitution allowed him to do in his capacity as a public employer. In so doing, *Engquist* makes the plaintiff's burden of producing authority "clearly establishing" the law in such a manner as to have put an officer/employer on notice that, *Engquist* notwithstanding, he might subject himself to constitutional liability by acting in a particular manner that much harder.

Aside from their status as public employers, this court believes that subjecting the defendants in this case to individual liability is made considerably more difficult by the fact that, in revoking her leave benefits, they were acting as voting members of the Board of Supervisors. While § 1983 law does not preclude individual liability in such circumstances, it does make it more difficult. *See, e.g. George v. Shelton*, 1999 WL 33537122, at *2 (N.D. Miss. Mar. 18, 1999)(rejecting attempts to hold an individual supervisor liable for a decision made by the Board of Supervisors as a whole). Moreover, much of the helpful procedural due process authority available to plaintiff, such as the Fifth Circuit's observation that "[t]he basic requirement of constitutional [procedural] due process is a fair and impartial tribunal," *Valley v. Rapides Par. Sch. Bd.,* 118 F.3d 1047, 1052 (5th Cir. 1997), seems more appropriately addressed to the County as an institution, and not to the Board members individually. This court also notes that, while Burdette's actions in this case seem quite difficult to defend, he will at least be able to argue that, in acting as employer, he was making an honest evaluation of plaintiff's job performance. And while it seems quite unlikely to this court that Burdette would have reacted in the manner which he did to plaintiff's handling of someone *else*'s custody dispute, this issue seems less clear-cut than if he had sought to have plaintiff disciplined for, say, rejecting his romantic advances. This court notes that, in light of *Engquist*, it is far from clear that plaintiff would have had an individual claim against Burdette even in the latter scenario, but the legal obstacles facing her seem considerably more difficult under the facts of this case.

This court further notes that, in addition to providing additional substantive hurdles for plaintiff to surmount in order to recover against defendants individually, qualified immunity law also restricts the type of authority upon which she may rely in establishing her claims against them. The Fifth Circuit's decision in *Valley* provides a good illustration of this fact, since while

this court regards the requirement of an impartial tribunal as a bedrock requirement of due process, it is clearly law which is cast at a "high level of generality." Applying such generalized principles of law is entirely appropriate in considering plaintiff's claims against the County, but the Fifth Circuit has emphasized in several dozen qualified immunity opinions that "[i]t is the plaintiff's burden to find a case in [her] favor that does not define the law at a 'high level of generality.' " *Bustillos v. El Paso Cnty. Hosp. Dist.,* 891 F.3d 214, 222 (5th Cir. 2018), citing *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (quoting *Cass v. City of Abilene*, 814 F.3d 721, 733 (5th Cir. 2016)).

In light of this precedent, this court would not be permitted to rely upon the requirement of an impartial tribunal in considering whether plaintiff had "clearly established" the law in support of her claims against the individual defendants, since it is clearly cast at a high level of generality. Moreover, while this court does not understand the harm in applying bedrock principles of law to new fact patterns in order to address clear injustices, and, in fact, believes such to be the beauty of the common law tradition, it is ultimately bound by the Supreme Court's qualified immunity jurisprudence and is not at liberty to disregard it. It is thus apparent that, particularly in this case involving defendants sued as voting members of a Board of Supervisors acting as public employers, qualified immunity law establishes one hurdle after another for plaintiff to surmount, and it agrees with defendants that the generalized and factually distinct authorities cited in her brief are insufficient to surmount these hurdles. Indeed, plaintiff concedes that she "cannot point to a case directly involving a Board of Supervisors voting to garnish a county employee's wages as this issue does not appear to have been litigated," [brief at 11] and, while this court is quite sympathetic to plaintiff's inability to find factually similar cases, qualified immunity law is much less forgiving in this regard. This court therefore

concludes that the qualified immunity defenses raised by the individual defendants must be sustained and that she should proceed in this case solely on her claims against the Board members in their official capacities, which is, as stated previously, an action against Panola County itself.

In concluding that plaintiff states a viable procedural due process claim against the County, this court is influenced by its conclusion that she makes a quite plausible claim that not merely one, but three, members of the Board of Supervisors were heavily biased against her: a number sufficient to bind the County. While this court thus regards plaintiff's proof of bias in this case as strong, it is not suggesting that she can recover against the County for procedural due process violations simply because three of the Board members were biased against her. To the contrary, it seems clear that she will also have to offer specific proof that her property was unlawfully taken from her without due process of law. Still, this court is far more likely to conclude that jurors should be allowed to decide whether a plaintiff has established a due process violation in cases where the evidence suggests that a Board of Supervisors acted based upon vindictiveness or some other improper motive than if it were simply calling balls and strikes to the best of its ability. In so stating, this court notes that Supreme Court precedent makes it clear that simple negligence is insufficient to establish a due process *violation, see, e.g. Davidson v. Cannon*, 474 U.S. 344 (1986), and, that aside, this court is more willing to force a municipality to incur the expense of trial if it believes that it acted with an improper motive.

Although it seems clear that plaintiff's allegations of bias are strongest against Burdette personally, this court believes that the basic allegations of this case present a strong inference that the other two defendant supervisors may have "had it in for her" as well. In so stating, this court notes that, under the allegations of the amended complaint, Burdette had demonstrated all

the subtlety of a bull in a china shop in seeking to punish plaintiff for her actions. Indeed, plaintiff alleges that Burdette allowed himself to be caught on video promising to "make her pay" for her actions and that immediately afterwards, he began openly pressuring the Sheriff to discipline her. The amended complaint thus alleges that Burdette had been throwing his weight around at high levels of county government in order to punish plaintiff, and this court is frankly skeptical that, in the small community of senior county officials in Batesville, word did not "get around" that Supervisor Burdette was "out to get" plaintiff.

This court is further skeptical that when, lo and behold, Burdette saw fit to raise the issue of leave benefits which had previously been awarded to plaintiff before the Board of Supervisors, any of the Supervisors would have been ignorant of the fact that they were being asked to rule upon an issue which was being raised in furtherance of a personal vendetta. Under these circumstances, even if Supervisors Flint and Weaver insist at trial that they were under no influence from Burdette and that their votes to revoke plaintiff's leave were in the finest traditions of good governance, this court does not believe that jurors, exercising their life experience and common sense, would be under any obligation to believe them.

In the court's view, the already strong odor emanating from the Board's decision to take up the issue of this low-level employee's leave benefits, in the time, circumstances and manner in which it did, is rendered even stronger by the numerous procedural irregularities asserted by plaintiff in her complaint. To reiterate, plaintiff alleges in her amended complaint that:

> 26. The Panola County Board of Supervisors Board Attorney, Gaines Baker, advised that an opinion was being requested from the Mississippi Attorney General's Office in order to guide the Board in its decision.
>
> 27. On or around May 2, 2022, Baker told counsel for the Plaintiff he would provide a copy of the opinion as soon as it was received.

28. On or around August 2, 2022, Plaintiff was notified by her supervisor that the Board of Supervisors had voted the day before, August 1, 2022, to require her to repay the wages she was paid while on leave.

29. Neither Plaintiff nor her attorneys were notified that the Board would be considering the issue. Rather, they had been assured by Mr. Baker that the Board was awaiting the Attorney General's opinion.

30. The Board had not received the opinion from the Attorney General's office at the time of its vote. Baker confirmed this with counsel for Plaintiff.

31. Defendants Burdette, Flint, and Weaver voted in favor of the repayment while the other two Board members voted against it. The vote was initiated by motion of Defendant Burdette and then seconded by Defendant Weaver.

32. Subsequently, Defendants began garnishing Plaintiff's wages without proper authority or following proper procedure.

33. Mississippi law requires an order of judgment, decree or attachment, from a court, to entitle a creditor to garnish the wages of the debtor. Mississippi law further requires that the debtor be served in accordance of law with the writ of garnishment. Specifically, the Plaintiff, as an employee of a county, should be properly served with the writ of garnishment and due process provided to her should she wish to oppose the writ of garnishment.

34. Defendants did not seek an order of judgment, decree or attachment from a court to entitle them/it to garnish Plaintiff's wages. Further, Defendants did not serve Plaintiff correctly with a writ of garnishment, likely due to the fact that Defendants have failed to seek the issuance of such in a court of law.

35. Plaintiff was not served and/or provided with a copy of the Board's Order until she requested it on October 14, 2022.

[*Id.* at 6-7]. Accepting these allegations as true, this court believes that they depict a Board of

Supervisors which, for whatever reason, appeared to be in a great hurry to revoke plaintiff's

leave benefits, even before it had all the facts before it and even without giving her the notice

and hearing to which, she alleges, she was entitled under the Fourteenth Amendment. It took all

three of the defendant supervisors, not simply Burdette, to take these actions, and this court

therefore does not believe that defendants Flint and Weaver can easily wash their hands of the

appearance of bias and vindictiveness which emanate from the Board's actions in this case.

17

This court concludes that plaintiff's allegations of procedural irregularities work in tandem with her proof of bias to form a quite viable procedural due process claim against the County. That being the case, this court is rather strongly inclined, barring unexpected revelations in discovery, to conclude that jurors should determine whether plaintiff's procedural due process rights were violated by Panola County in this case. In arguing otherwise, defendants insist that plaintiff is unable to establish a loss of "property" in this case, but this court concludes that her allegations that she lost leave benefits which she had previously been awarded and that she had her wages garnished without due process provide her with a very reasonable argument that she did, in fact, suffer a loss of property in this case. Indeed, plaintiff alleges that the salary which she had worked for was garnished without due process, and, if that salary was not her property, then what exactly was it? This court therefore concludes that the County's motion to dismiss should be denied as to the procedural due process claims against it, although it will, as stated previously, grant its motion to dismiss the Equal Protection claims asserted against it. This court notes that plaintiff asserts a civil conspiracy claim, but such a claim does not make a great deal of sense in a case in which the County is the sole remaining defendant, and it will therefore be dismissed.[2]

Having addressed the merits of this case, this court now must consider a *res judicata* argument raised by defendants, which is based upon the fact that, following the adverse decision of the Panola County Board of Supervisors, plaintiff appealed its ruling to the Circuit Court of

---

[2] This court also notes that plaintiff asserts state law claims in this case, and, in their brief, defendants do not address the substantive merits of these claims, instead arguing that this court should decline to exercise supplemental jurisdiction over them, after dismissing all the federal claims. [Brief at 30]. In its order today, this court is not, in fact, dismissing all of plaintiff's federal claims, and defendants' supplemental jurisdiction arguments are therefore moot.

Panola County via a Bill of Exceptions. That court dismissed the Bill of Exceptions as untimely, based upon a Mississippi statute which grants "[a]ny person aggrieved by a judgment or decision of the board of supervisors" ten (10) days in which to appeal that decision to a circuit court. *See* Miss. Code Ann. § 11-51-75. Based upon this finding of untimeliness, the circuit court dismissed the Bill of Exceptions, and, in their briefing, defendants place heavy emphasis upon the fact that its order stated that the dismissal was "with prejudice." [Docket entry 34-4].

*Res judicata* "bars a second action between the same parties on the same subject matter directly involved in the prior action." *EMC Mortg. Corp. v. Carmichael*, 17 So. 3d 1087, 1090 (Miss. 2009). Defendants note that Mississippi law governs this issue, and while it appears that many of the elements of *res judicata* are met in this case, a crucial one is not. In a 2014 decision, the Mississippi Supreme Court emphasized that "for *res judicata* to apply, the defendant must show that the judgment rendered in the previous action was a final judgment on the merits." *Estate. of White v. White*, 152 So. 3d 314, 316–17 (Miss. 2014). In describing what kind of order constitutes a "final judgment on the merits," the Supreme Court wrote in *White* that:

> A final judgment on the merits is "[a] judgment based on the evidence rather than on technical or procedural grounds." While our prior cases have considered whether a judgment constituted a "final judgment on the merits" on a case-by-case-basis, a judgment generally will not be considered a "final judgment on the merits" when the first case was dismissed for a procedural defect or some other technical ground that prevented the court from reaching the merits of the case.

*White*, 152 So. 3d at 316–17.

It is thus apparent that a dismissal on "technical or procedural grounds" is not a judgment on the merits under Mississippi law. This court has reviewed the order of the Panola County Circuit Court, and it was expressly based upon a finding that, while the Bill of Exceptions was actually received by the Circuit Clerk on August 11, 2022, it was not actually "filed" until the civil cover sheet and filing fee were received on August 30, 2022 and was thus untimely under

state law. [Docket entry 34-4 at 3]. It is difficult for this court to imagine a dismissal that is more technical and procedural than this one, and it therefore concludes that, under *White*, the state court order was not a "judgment on the merits." This conclusion is not altered by the fact that the circuit court wrote that its dismissal was "with prejudice." This court believes that, in choosing these words, the circuit court was attempting to convey that plaintiff had one chance to properly appeal the Board of Supervisor's ruling via a Bill of Exceptions and that, having failed to timely do so, she could not file another appeal. In any event, it seems clear to this court that substance, and not labels, should govern the issue of what kind of judgment the circuit court entered, and that court clearly did not address the substantive merits of any claim for civil damages. Indeed, it seems clear to this court that plaintiff filed no such claim, notwithstanding the fact that her appellate arguments included assertions that the Board's decision was contrary to the U.S. Constitution.

This court has reviewed the Bill of Exceptions filed by plaintiff, and it makes clear that it was a statutory appeal of the ruling of the Board of Supervisors, and not a § 1983 claim for damages. [Docket entry 34-3]. The language of the Bill of Exceptions aside, the civil cover sheet included boxes which the plaintiff could check to indicate that she was making a civil claim, including a "civil rights" claim. Plaintiff checked none of those boxes, instead checking an empty box entitled "other" under the "Appeals" heading and writing the words "Bill of Exception" next to it. [*Id.*] Defendants insist that plaintiff "could have" raised a § 1983 claim in her Bill of Exceptions, but the relevant statute clearly provides that:

> The clerk thereof shall transmit the bill of exceptions to the circuit court at once, and the court shall either in term time or in vacation hear and determine the same on the case as presented by the bill of exceptions as an appellate court, and shall affirm or reverse the judgment. If the judgment be reversed, the circuit court shall render such judgment as the board or municipal authorities ought to have rendered, and certify the same to the board of supervisors or municipal authorities. Costs shall be awarded as in other cases.

Miss. Code Ann. § 11-51-75.

The Bill of Exceptions statute thus makes clear that the circuit court is to sit as an *appellate* court, and it is a basic feature of appellate courts that they may only rule upon the correctness of the ruling below, and not award any new damages. True enough, plaintiff cited federal law in seeking to overturn the Board of Supervisor's ruling, but she clearly did so in the context of an appeal seeking to render the decision null and void, not to obtain damages against the County for having issued the ruling. This rather obvious fact aside, it strikes this court that barring a plaintiff's § 1983 constitutional claim based on the assertion that she "could have" raised it in the Bill of Exceptions procedural device would essentially create a ten-day statute of limitations for filing § 1983 claims in this state. Such a result would decimate the rights of Mississippi plaintiffs to seek redress for constitutional violations against them, and this court can discern no possible justification for such a result.

The only reason this court regards this as being even a remotely close issue is the Fifth Circuit's 2019 decision in *MEC, Inc. v. Lowndes Cnty. Bd. of Supervisors*, 759 F. App'x 331, 336–37 (5th Cir. 2019), upon which defendants rely heavily in their brief. This court notes that *MEC* is an unpublished opinion which specifically stated that "[p]ursuant to 5th CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th CIR. R. 47.5.4."[3] This fact aside, this court

---

[3] This court notes that, aside from being an unpublished opinion, the *MEC* panel used quite cautious language, noting that "the Mississippi Supreme Court has held that other claims, perhaps in the nature if not form of a separate suit, can be presented and consolidated in the Circuit Court for resolution with the appeal from a board of supervisors." *Id.* The "perhaps" language appears to suggest a certain degree of equivocation on the Fifth Circuit's part and clearly falls short of an actual holding, which would, at any rate, be non-precedential in an unpublished opinion.

acknowledges that, in *MEC*, the Fifth Circuit did include language which at least raised the possibility that a plaintiff could consolidate a civil claim for damages with a statutory appeal of a Board of Supervisors' ruling and that, on that basis, *res judicata* might apply in certain cases. Specifically, the Fifth Circuit wrote that:

> As we analyze in greater detail in the final section of this opinion, the Mississippi Supreme Court has held that other claims, perhaps in the nature if not form of a separate suit, can be presented and consolidated in the Circuit Court for resolution with the appeal from a board of supervisors. *See Falco Lime, Inc. v. Mayor & Aldermen of City of Vicksburg*, 836 So.2d 711, 717-20 (Miss. 2002). Not only could other claims be brought, they were brought by MEC. In its amended bill of exceptions, it claimed that a "loss of property and liberty interest[s]" is the central issue in this case. More specifically, it said it "is making a 'substantive' due process claim." As for relief, MEC sought specifically the exemption for its business and "any other relief to which it is entitled."

*MEC*, 759 F. App'x at 335–36.

In the court's view, an important distinguishing factor between *MEC* and this case is that, in *MEC*, the plaintiff actually used language in its Bill of Exceptions which indicated that it was "making a substantive due process claim" alongside its appeal of the Board of Supervisor's ruling. *Id.* In this case, by contrast, this court's reading of plaintiff's Bill of Exceptions is that she was merely filing an appeal under § 11-51-75, and this is, once again, what this court submits a reasonable person reading the statute would believe that it is for. Indeed, § 11-51-75 is entitled "Appeal to circuit court from board of supervisors, municipal authorities," and all of the provisions which follow are of exactly the sort one would expect from a statute establishing a right to appeal, not to bring an initial civil action. Having said that, this court does acknowledge that the Mississippi Supreme Court in *Falco Lime* appears to have at least acquiesced in the ability of a plaintiff to assert substantive claims alongside a statutory appeal of a ruling of a Board of Supervisors, as the Fifth Circuit noted in *MEC*. *Id.* at 335.

While this procedural option arising from *Falco Lime* thus clearly exists, it appears to represent an "off-the-menu special" of sorts whose existence is not even hinted at in the actual language of § 11-51-75. Moreover, this court does not believe that the law would be well served by making an exhaustive knowledge of every Mississippi Supreme Court decision a requirement for filing a Bill of Exceptions, particularly since § 11-51-75 provides a mere ten days for filing such an appeal, and many litigants are forced to do so without the assistance of counsel. It can certainly be argued that having procedural options is a good thing, and for those litigants (like the plaintiff in *MEC*) who choose to assert actual claims in their Bill of Exceptions, it is arguably proper to hold them to their actions.[4] Once again, however, this court strongly suspects that most litigants reading § 11-51-75 would – quite reasonably - read it as purely a mechanism for appealing an adverse ruling of the Board of Supervisors and not suspect that it was actually a *res judicata* trap lying in wait to destroy their chances of ever asserting their federal rights, if they make the slightest mention of the U.S. Constitution in making their appellate arguments.

This court submits that, for those plaintiffs appealing a Board ruling in good faith under the clear language of § 11-51-75, playing a game of "gotcha!" whereby the court pulls out *Falco Lime* and informs the plaintiffs that, based on this somewhat obscure judicial decision, they "could have" asserted a § 1983 claim in the context of what appears to be a purely appellate statute, and that, having failed to do so, they are forever barred from asserting their constitutional rights, would be beyond the pale. Defendants invite this court to play such a game of "gotcha!" in this case, but it declines to do so. In so declining, this court notes that district courts in this state routinely consider § 1983 actions against municipalities in which the record includes

---

[4] This court submits that, in order to do so, the "claim" should make clear that it is one for damages and not simply "claiming" something on appeal.

references to statutory appeals of rulings of a Board of Supervisor or Board of Aldermen. Appealing such city and county board rulings is a crucial arrow in the quiver of potential plaintiffs who seek to assert their rights, and, where successful, such appeals can prevent unnecessary § 1983 litigation.

Treating bill of exceptions as a *res judicata* trap would clearly dissuade potential § 1983 plaintiffs from asserting their statutory appeal rights, and, where they did file such appeals, those appellants believing that the municipality's ruling was contrary to the U.S. Constitution would have to bite their tongues and not mention it, out of fear of a potential *res judicata* effect. That, in turn, would provide less accountability for constitutional violations, and thereby tend to make it more likely that they would be committed in the first place.

This court submits that appeals under § 11-51-75 are comparable to the exhaustion of remedies in other administrative contexts, and, in this court's experience, federal law encourages or even *requires* potential litigants to exhaust their administrative remedies; it does not punish them for it. Having said that, this court would hasten to add that it seems quite appropriate to apply *res judicata* in cases where a plaintiff files a state court civil action for damages and simply neglects to raise a § 1983 claim in that action. In that scenario, the plaintiff should have been aware that, since he was filing an actual civil action to recover for his injuries, he should include whatever state or federal remedies he has at his disposal, lest they be lost forever based upon a finding of *res judicata*. Indeed, this court notes that it found *res judicata* applicable based upon similar facts in a recent decision. *See Bell v. Tallahatchie Cnty.*, 440 F. Supp. 3d 569, 574–75 (N.D. Miss. 2020).[5] This court submits, however, that the average litigant reading §

---

[5] Defendants cite *Bell* in their briefing, and, in so doing, they place particular emphasis on the fact that it, like this case, involved a dismissal of claims "with prejudice." In *Bell*, however, the parties themselves chose to agree to a dismissal of state court claims with prejudice, under

11-51-75 would never suspect that, if he chose to exercise his appellate rights, he might forever lose his ability to assert a constitutional claim under § 1983.

Having noted its concerns about an overbroad application of *MEC*'s holding, this court finds that *MEC* is fully distinguishable from this particular case, and, indeed, offers tacit support for the rejection of defendants' *res judicata* arguments here. In so stating, this court emphasizes that, in finding *res judicata* applicable in *MEC*, the Fifth Circuit placed heavy emphasis on the fact that, unlike here, the appellate ruling of the circuit court in that case was on the merits. Specifically, the Fifth Circuit wrote in *MEC* that:

> Here, the Mississippi Circuit Court entered a final judgment on the merits. It did not dismiss the case on a technical or procedural ground. Rather, it reviewed the evidence and ruled on the merits, explaining, in its view, that because no taking occurred, no deprivation of due process occurred. It further ruled that the Board's decision to deny the restaurant exemption was supported by substantial evidence and was not arbitrary or capricious. The Circuit Court then dismissed the case with prejudice. Thus, it entered a final judgment on the merits.

*MEC*, 759 F. App'x at 336–37. It thus seems clear to this court that the *MEC* panel would have rejected an application of *res judicata* here, since at no point in its highly technical and procedural ruling did the state court in this case address the substantive merits of plaintiff's claims. This court regards this point as being quite clear, and, that being the case, it was, strictly speaking, unnecessary for it to note its concerns about other aspects of *MEC*'s holding being applied in an overbroad manner to cases such as this one.[6] This court has only noted its concerns

---

circumstances which clearly suggested that they had reached a settlement of all civil damages claims, with no effort made to exempt any potential federal claims from the scope of the settlement. *Id.* Nothing remotely comparable occurred in this case.

[6] By "cases such as this one," this court means cases in which it seems clear that the plaintiff was simply filing an appeal in good faith based upon the clear provisions of § 11-51-75, regardless of whether or not that plaintiff mentioned the U.S. Constitution or federal law in making that appeal.

on this issue because of its potential importance for future cases, in which, it anticipates, other defendants will raise arguments similar to those asserted by the County here.

As a final point, this court would observe that, in their briefing, defendants provide no hint that they will be able to factually dispute plaintiff's core allegations relating to its Board of Supervisor's actions in this case. Of course, defendants, like this court, are required to accept plaintiff's allegations as accurate at the Rule 12 dismissal stage, and their silence on this issue may simply reflect this fact. Assuming, however, that the County does not have any real factual disagreement with plaintiff's recitation of the facts, then this court believes that it should seriously consider whether it wishes to defend the actions of its Board of Supervisors in this case or instead seek a fair settlement. In so stating, this court observes that the manner in which the Board of Supervisors appeared to be in a great rush to revoke the leave benefits of a low-level county employee, immediately after she angered one of its members by simply doing her job, gives an extremely poor impression of the sort of governance which is prevailing in Panola County at this time. This court believes that this impression might be improved by the County's admitting its mistakes and making amends for them. For plaintiff's part, this court believes that she may wish to consider the fact that, while it regards her allegations as quite substantial, this case concerns the revocation of leave benefits in an amount which may not support a large verdict, however difficult to defend the County's actions in this case may be. This court therefore recommends that both sides realistically evaluate their positions in this case and explore the possibility of settlement.

In light of the foregoing, it is ordered that the individual defendants' qualified immunity motions are granted. The County's motion to dismiss is granted with regard to the Equal Protection and civil conspiracy claims against it, but it is denied with regard to the procedural

due process claims against it.  Plaintiff's motions to dismiss a prior dismissal motion as moot [33-1] and for an extension of time to respond to the current motion to dismiss [29-1] are granted.

This, the 2nd day of January, 2024.

/s/ Michael P. Mills
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI